FIRST NATIONAL BANK AND TRUST COMPANY OF EVANSTON, Trustee, Plaintiff-Appellee and Cross-Appellant, *v.* EDWARD J. ROSEWELL, Treasurer of Cook County, *et al.*, Defendants-Appellants and Cross-Appellees.— (THOMAS C. HYNES, Assessor of Cook County, Defendant.)

First District (4th Division)    No. 80-1942

Opinion filed October 22, 1981.

Richard M. Daley, State's Attorney, of Chicago (Jane Clark Casey and Michael F. Baccash, Assistant State's Attorneys, of counsel), for appellants.

James A. Rooney, of Chicago, for appellee.

Mr. JUSTICE LINN delivered the opinion of the court:

Defendant, Edward Rosewell, in his position as county collector, appeals from an order entered in the circuit court of Cook County permanently enjoining him from collecting approximately $700,000 in 1978 real estate taxes allegedly owed by plaintiff, First National Bank and Trust Company of Evanston, the legal title holder of improved business property in Evanston. Plaintiff cross-appeals from a judgment entered in favor of defendants Harry Semrow and Seymour Zaban, in their positions as Commissioners of the Board of (Tax) Appeals, on a civil rights claim for damages and injunctive relief brought by plaintiff under 42 U.S.C. §1983 (1976).

We affirm.

*Facts*

Plaintiff holds legal title to improved business property in Evanston in a land trust for a limited partnership known as American Plaza Associates (hereinafter the partnership). In October 1977, the partnership completed construction on the property of an 18-story office building. This office building was the sole income producing asset of the partnership. Following the completion of the building, the partnership began the process of renting space in the building. By the end of 1978, the building was only partially occupied. In the middle of 1978, the partnership received notice from defendant Thomas Hynes, in his position as county assessor, that the assessed value of the property for 1978 had been determined to be approximately $8 million. This represented a fair cash value of the property of approximately $20 million since the applicable assessment rate was 40 percent. The $8 million assessment was an increase of $6 million over the 1977 assessed value of $2 million.

After receiving the notice, the partnership filed a complaint with the assessor seeking a decrease in the 1978 assessment to $3.1 million. In its complaint, the partnership alleged that the building on the property had cost $17 million to construct and even under a replacement cost approach the $8 million assessment representing a $20 million fair cash value was excessive. The partnership pointed out that the office building was only in its first year of operation, that it had only been partially rented, and that the estimated gross income the partnership would receive from the property in 1978 was approximately $3 million. The partnership requested that the assessor take into consideration the problem of renting the building in its first year, and requested that the assessor use primarily an income capitalization approach to determine the fair cash value of the property.

This request was based on guidelines used by the assessor and known to the partnership as being applicable to income producing property. After taking certain deductions from gross income usually allowed by the assessor for determining the figure to be capitalized, the partnership contended that the fair cash value of the property based on an income capitalization approach was a little less than $8 million and the assessed value for 1978 should be $3.1 million.

After being supplied with necessary documentation, the assessor's employee in charge of handling the complaint agreed with the partnership that the income capitalization approach should be given primary consideration, but disagreed with some of the figures supplied by the partnership. The employee determined that the fair cash value for the property should be set at approximately $8.5 million with an assessed value of $3.4 million. The employee, after receiving authorization, told the partnership that he would change the assessor's rolls to show an assessed value for 1978 of $3.4 million. The employee also told the partnership that this assessed value would apply for 1978 only and the property would be reassessed in 1979 when the income from the property would probably be higher.

The assessor's decision to lower the 1978 assessed value to $3.4 million was made in early November 1978. After the decision was made, it was discovered that the assessor's rolls for 1978 for Evanston had already been certified to the Board of Appeals. Once certified, assessed values can only be changed by the Board of Appeals. The assessor's employee told the partnership what had occurred and suggested that the partnership could pursue either of two statutory methods for getting the assessment changed. The employee said that the assessor could certify a mistake to the Board (see Ill. Rev. Stat. 1979, ch. 120, pars. 594(2), 603), or the partnership could file a complaint with the Board and the assessor would file a recommendation that the assessed value be changed to $3.4 million (see Ill. Rev. Stat. 1979, ch. 120, par. 594(1)).

The partnership chose the latter course and, in late November 1978, it filed a complaint with the Board requesting a decrease in the assessment to $3.1 million. The assessor filed a recommendation that the assessed value be changed to $3.4 million. Thereafter, without explanation, the Board of Appeals, consisting of Commissioners Semrow and Zaban, dismissed the complaint and left the assessed value at $8 million.

In 1979, when the 1978 real estate taxes became due, the partnership paid approximately $600,000 in real estate taxes, the amount it would have owed if the $3.4 million assessment recommended by the assessor had been accepted by the Board. The partnership refused to pay an additional $800,000 in taxes allegedly owed based on the $8 million assessment.

Instead, the partnership (through plaintiff) brought the present three-count action in the circuit court of Cook County.

In count I, the partnership sought a permanent injunction against defendant Rosewell to prevent him from collecting the additional $800,000 in taxes and any penalties or interest owed on the amount because of the partnership's failure to pay the taxes on time. The partnership alleged that the $8 million assessment was constructively fraudulent because it was almost 2½ times the assessment determined by the assessor himself to be correct and because the Board of Appeals had failed to apply any known standards to determine that the $8 million assessment was correct. The partnership alleged that its remedy at law, to pay the taxes under protest and then file its objections in court when the collector filed his application for judgment (see Ill. Rev. Stat. 1979, ch. 120, pars. 675, 716), was inadequate. The partnership pointed out that it did not have the assets to pay the additional taxes because the partnership's sole source of income was the office building, and it did not have the cash on hand to pay the additional taxes since its total net income from the first year of operation was less than the amount of the taxes. The partnership admitted that it could borrow the amount necessary to pay the tax but contended it would have to pay 13.5 percent per year in interest (the prime rate at the time the complaint was filed). The partnership alleged that, on the average, it takes two years for an improper tax to be returned to the taxpayer, and thus it would cost the partnership approximately $200,000 to pursue its legal remedy since no interest is paid by the collector on amounts refunded to taxpayers. The partnership asserted that it was unreasonable to require it to pursue its legal remedy in the circumstances of this case and injunctive relief should be granted.

In count II, the partnership sought legal and equitable relief under 42 U.S.C. §1983 (1976). The partnership alleged that the Board's arbitrary determination to leave the assessment at $8 million denied it equal protection of the laws under the Fourteenth Amendment to the United States Constitution. The partnership sought damages of $100,000 from Commissioners Semrow and Zaban for depriving it of its constitutional right and sought an injunction against defendant Rosewell to prevent him from collecting the additional taxes.

In count III, the partnership requested that a writ of *certiorari* be issued to the Board of Appeals, that the proceedings in which the Board determined that the $8 million assessment was correct be quashed, and that an injunction be issued to prevent Rosewell from collecting the additional taxes.

The defendants answered the complaint denying all of the essential allegations except that defendant Thomas Hynes, in his position as county

assessor, admitted that the $8 million assessment was incorrect and admitted that the assessor had recommended a $3.4 million assessment. The assessor asserted, however, that upon further review of the information it had on file (some of it supplied by the partnership after the complaint was filed), the assessor believed that the proper assessed value of the property for 1978 should have been approximately $4.3 million.

The case went to trial. During plaintiff's case-in-chief various documents and testimony were presented to show that the partnership had a gross income of approximately $3 million in 1978 and that, after expenses, it did not have the cash on hand to pay the taxes. Plaintiff called various witnesses, among whom were employees of the assessor's office who had worked on plaintiff's file. These employees explained that the assessor uses three basic methods to determine the fair cash value of property: the market approach, the income capitalization approach and the replacement cost approach. The employees explained that the assessor had established various standards to be followed in determining the fair cash value of any particular piece of property and these standards were made known to persons who complained to the assessor about the assessed value of property.

It was brought out that all three methods of evaluation would be considered by the assessor with the market approach—an examination of recent sales of similar property in the same general area—being the preferred method. However, on office buildings, the market approach was admitted to be of little value because of a usual lack of recent sales of similar structures. For office buildings, the assessor looks primarily to the income capitalization approach and the replacement cost approach.

One of the employees that handled the partnership's file stated that with new office buildings, the assessor would give particular consideration to the problem of getting the building filled with tenants in the first year of operation and that the income capitalization approach would be given primary consideration, though all approaches were considered. The employees testified that after considering the partnership's file, they determined that the $3.4 million assessment was correct. One employee who had not seen the file until after it was updated following the filing of the complaint said that he would have recommended an assessed value of $4.3 million if all the information had been available in 1978. None of the employees contended that the $8 million assessment was correct.

Plaintiff called defendant Semrow under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60). Semrow stated that he had been on the Board of Appeals for 10 years. The bulk of plaintiff's examination of Semrow consisted of an attempt to determine why the Board had dismissed plaintiff's complaint and left the assessed value at $8 million. He said the Board dismissed the complaint because it had not

been provided sufficient evidence to reach a reasonable conclusion. He said he had been confused because he did not understand how a piece of property with a newly constructed $17 million office building on it could have a fair cash value of only $8 million. He said that he believed that plaintiff had failed to meet its burden of proof to show that the $8 million assessment was incorrect. When asked what plaintiff had to prove beyond showing that the assessor himself believed the proper assessment should be $3.4 million, Semrow failed to give any explanation. When asked what standards the Board applies in determining a proper assessment, Semrow answered it depended on the facts of the case. When asked whether Semrow, as a member of the Board, used the same standards as the assessor to determine value, Semrow answered that he did not know what the assessor did, that the Board was totally autonomous and used its own standards. When again asked what those standards were, Semrow repeated that it depended on the facts of the case. When asked whether Semrow, as a member of the Board, had used a replacement cost approach or an income capitalization approach, Semrow answered, at one point, that he considered a replacement cost approach, but, at another point, he said, "I didn't establish a cost approach, I didn't establish an income approach, I based my whole judgment on the way I answered * * * before."

At one point in the examination, Semrow claimed that he may have dismissed the complaint because, though the income statements supplied to him were verified, he had requested an audited statement and the partnership had failed to provide one. (The partnership had informed him that it would try to get one, but the complaint was dismissed before one was supplied.) However, when Semrow was asked why the audited statement was considered important, he replied that he did not remember.

Plaintiff also showed that the assessor had determined that the 1979 assessed value of plaintiff's property would be approximately $6 million.

At the conclusion of plaintiff's case-in-chief, the trial court granted a motion for judgment in favor of the defendants on count II of the complaint, the civil rights claim, but denied the motion as to the other counts.

Defendants presented evidence to show that the property was subject to an outstanding mortgage of $20 million. Defendant also submitted into evidence a partnership letter written in 1978 which mentioned that a third party, who did not testify, had made a tentative offer to purchase the property with the building for $25 million. The court allowed this letter to be admitted as proof that an offer was made but refused to allow it as evidence to prove that the property had a market value of $25 million. No evidence was presented to show that the Board had considered the mortgage or the offer when it determined that the $8

million assessment was correct. No one ever testified to the belief that the $8 million assessment was correct, including Semrow, who simply said he did not believe plaintiff had presented sufficient evidence to show it was incorrect.

In final argument, defendants' attorney, after contending that plaintiff had failed to show that the remedy at law was inadequate or that the $8 million assessment was constructively fraudulent, went on to argue what he believed to be the proper assessment of the property for 1978. He presented a chart with the partnership's income figures for 1978. Based on these figures, the attorney argued that the 1978 assessed value of the property should be set by the court to be $3.9 million based on an income capitalization method.

In its final order, the trial court found that the $8 million assessment was constructively fraudulent, that plaintiff had no adequate remedy at law, and that a permanent injunction should be issued. Nevertheless, the court found that the proper assessment for 1978 should have been $3.9 million, the amount suggested by defendants' attorney. Based on this finding, the court ordered plaintiff to pay any additional tax owed based on the $3.9 million figure. The court also granted plaintiff's request for a writ of *certiorari* to the Board and quashed the proceedings had before the Board in which it affirmed the $8 million assessment.

Defendants Rosewell, Semrow, and Zaban appealed. Rosewell has challenged the court's issuance of an injunction, and Semrow and Zaban have challenged the court's issuance of a writ of *certiorari*. Defendant Hynes has not appealed. Plaintiff cross-appealed and has challenged the court's order granting defendants' motion for judgment on the civil rights claim brought under 42 U.S.C. §1983 (1976).

OPINION

I

## Defendants' Appeal

Injunctions to prevent the collection of real estate taxes are generally allowed in only three situations: (1) when the property is exempt from taxes; (2) when the tax is unauthorized by law or void; (3) when the tax, or the assessment upon which the tax is based, is fraudulent or constructively fraudulent and the remedy at law is inadequate. (*Clarendon Associates v. Korzen* (1973), 56 Ill. 2d 101, 306 N.E.2d 299.) It is the third situation which is alleged to be applicable to this case. Defendants assert that plaintiff failed to show that the remedy at law was inadequate or that the $8 million assessment was constructively fraudulent. We hold that in the circumstances of this case the injunction to prevent the collection of the additional taxes was properly granted.

*Constructive Fraud*

Defendants argue that plaintiff failed to show that the $8 million assessment was constructively fraudulent. They assert that based on a replacement cost approach for determining fair cash value, the property could have been deemed to be worth $20 million in 1978. They also argue that the letter mentioning the 1978 offer to purchase the property for $25 million should have been admitted as evidence tending to show the fair cash value of the property under the market approach. Based on this, defendants claim that the property could have been deemed to be worth $20 million in 1978 under the market approach. Since either of the above approaches would give an assessed value of the property in 1978 of $8 million, defendants contend that plaintiff failed to show the $8 million assessment was excessive at all and thus failed to meet its burden to prove the assessment was constructively fraudulent.

Even assuming that the letter should have been admitted as evidence of value, defendants' argument is still unacceptable. The question here is not what standards should have been used to determine value, but whether the Board of Appeals used any standards. When plaintiff went before the Board of Appeals, it had the burden of proving the $8 million assessment was improper. Once the assessor, the official whose duty it is to determine assessed values, admitted to the Board that the $8 million assessment was incorrect and a $3.4 million assessment was correct, plaintiff had undoubtedly met its burden. Contrary to Commissioner Semrow's belief at trial, the Board could not ignore the assessor's recommendation entirely. The Board is not an autonomous body that can set its own standards for determining assessed values. Under the law, the assessor and the Board are required to act jointly in establishing standards for determining assessed values. (Ill. Rev. Stat. 1979, ch. 120, par. 494.) Apparently, in Cook County, only the assessor has made public the standards used for determining assessed values. (See Ganz & Laswell, *Review of Real Estate Assessments—Cook County (Chicago) vs. Remainder of Illinois*, 11 J. Mar. J. Prac. & Proc. 16 (1977).) However, it must be assumed that these standards were adopted in accordance with the law, meaning that the assessor and the Board concurred in their adoption. Hence, the Board was bound to apply the same general standards used by the assessor.

The Board, perhaps, could have determined that the assessor should not have relied primarily on the income capitalization approach under the facts of the particular case, but the Board had to use known and existing standards before it could reject the assessor's recommendation outright. In the present case, it is obvious from Commissioner Semrow's testimony that the $8 million assessment was arbitrarily affirmed. The only understandable reason given by Semrow for affirming the assessment was that

he was confused, and we believe that if a taxpayer is about to be placed in a position of owing a million dollars in real estate taxes, there should be more justification than the simple fact that a public official was confused.

It is peculiar in this case that no one at trial ever testified to the belief that the $8 million assessment was correct. Commissioner Semrow merely stated that he believed plaintiff had failed to meet its burden in proving the $8 million assessment was improper. By the conclusion of the trial, even the defendants' attorney was arguing for a $3.9 assessment. This argument was actually adopted by the trial court.

■▮ From all of the facts in this case, it is clear that plaintiff met its burden of proving the $8 million assessment for 1978 was excessive and constructively fraudulent. The assessor admitted, from the beginning, that it was excessive. The assessor admitted that under applicable standards the proper assessment was between $3.4 and $4.3 million. The Board of Appeals had no known reason for affirming the $8 million assessment. The 1979 assessment has been set at only $6 million. The defendants' attorney argued that a $3.9 million assessment was proper. Obviously, the trial court was correct in finding the $8 million assessment constructively fraudulent. *Cf. People ex rel. Nordlund v. Lans* (1964), 31 Ill. 2d 477, 202 N.E.2d 543.

### Adequate Remedy at Law

Defendants argue that plaintiff failed to show the remedy at law was inadequate. Citing *Clarendon Associates v. Korzen* (1973), 56 Ill. 2d 101, 306 N.E.2d 299, defendants contend that plaintiff, to prove the inadequacy of the remedy at law, had to show the remedy at law was "unavailable." Defendants contend that to do this plaintiff had to show that it was impossible for it to pay the taxes under protest and challenge the collector's application for judgment in court. Defendants argue that since the partnership admitted it could borrow the money to pay the taxes, the "unavailability" of the remedy at law was not shown. Defendants, in the alternative, contend, that even if the partnership need not have shown that it was unable to borrow the money to pay the taxes, the partnership should have been required to show that all of the partners, from their personal assets, could not have paid the taxes, and not just merely that the partnership entity did not have the funds to pay the taxes.

Though *Clarendon Associates v. Korzen* contains language to the effect that an injunction against the collection of taxes should be denied unless the taxpayer shows the remedy at law is unavailable, the language of that opinion was tempered somewhat in the subsequent opinion of *Hoyne Savings & Loan Association v. Hare* (1974), 60 Ill. 2d 84, 322 N.E.2d 833. There, the supreme court held that even when a taxpayer can pay the taxes, rare cases may present themselves where it would be ex-

tremely unjust to deny an injunction and require a taxpayer to pay the taxes under protest and forego the interest on his payment. We believe the present facts present such a case.

■■ Stripped to the basics, this case presents the following scenario. Defendants contend that plaintiff should be denied an injunction and be required to lose over $200,000 in interest by pursuing its legal remedy of paying the taxes under protest and then challenging the collector's application for judgment in court. Defendants make this contention though the assessor himself has always admitted that the $8 million assessment was excessive and that the taxpayer should pay taxes based on an assessment of $3.4 million to $4.3 million. Defendants make this contention despite their own argument that a $3.9 million assessment was proper and that the taxpayer should pay a tax based on that assessment. In essence, defendants contend that plaintiff should be required to lose over $200,000 in interest to pursue its legal remedy, not because there is any possibility that plaintiff owes an additional tax based on the $8 million assessment, but merely because a member of the Board of Appeals was confused. Clearly, it would be extremely unjust to require plaintiff to pursue its legal remedy in this case. Therefore, even assuming that the partnership could have paid the taxes, we would still hold that the injunction was properly issued in this case.

## II

Defendants also contend that the trial court erred in granting the writ of *certiorari* and quashing the proceedings had before the Board when it affirmed the $8 million assessment. In light of our decision on the constructive fraud count, we find we need not address this issue. The primary relief sought by plaintiff under count I of its complaint, the constructive fraud count, and count III, the writ of *certiorari* count, was the issuance of an injunction to prevent the collection of the additional taxes. Since we have found that the injunctive relief was properly granted under the constructive fraud count, it would be superfluous to consider whether the same relief should have been granted under the writ of *certiorari* count. Accordingly, we simply affirm the trial court's findings under count III without expressing any opinion as to whether a writ of *certiorari* was properly granted.

## III

### *Plaintiff's Cross-appeal*

Plaintiff has cross-appealed from the judgment entered for defendants at the conclusion of plaintiff's evidence on the civil rights claim brought under 42 U.S.C. §1983 (1976). In that claim plaintiff accused Commissioners Semrow and Zaban of violating plaintiff's right of equal protection of the laws (U.S. Const., amend. XIV) by affirming the $8

million assessment without applying any known standards of valuation. Plaintiff sought damages of $100,000 from Semrow and Zaban and an injunction against Rosewell to prevent him from collecting the additional taxes based on the $8 million assessment.

In entering judgment for defendants, the trial court found, after weighing the evidence, that plaintiff had failed to present a prima facie case against defendants.

■■ We note that plaintiff only claimed a violation of equal protection of the laws and not a violation of due process. From the evidence at trial plaintiff presented an arguable case for violation of due process in that Semrow failed to apply any standards in affirming the $8 million assessment but there was little evidence from which a violation of equal protection could be inferred. We also note that no direct evidence was presented against Commissioner Zaban and the only evidence on damages was the damage plaintiff would suffer if it was forced to pay the additional taxes. At oral argument, plaintiff indicated that the civil rights claim was asserted primarily as another basis for obtaining the injunction and did not indicate any desire to amend its complaint or pursue the claim any further if the injunction were affirmed under the constructive fraud count. Hence, for all of these reasons, we affirm the judgment entered for defendants on the civil rights claim.

Accordingly, for the reasons noted, we affirm.

Affirmed.

JOHNSON and JIGANTI, JJ., concur.